United States District Court
Southern District of Texas
**ENTERED**
October 26, 2020
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| SAVAGE SE OPERATIONS, LLC, <br> Plaintiff, <br><br> vs. <br><br> WARTSILA NORTH AMERICA, INC, *et al*, <br> Defendants. | § § § § § § § § § § § § | CIVIL ACTION NO. <br> 4:19-cv-01681 <br><br><br> JUDGE CHARLES ESKRIDGE |

**MEMORANDUM AND ORDER COMPELLING ARBITRATION**

The motion to compel arbitration of this action is granted. Dkt 14. All claims are stayed until the arbitral proceedings conclude.

1. Background

This case arises under maritime law. It concerns damage to the *Sulphur Enterprise*, a ship owned by Plaintiff Savage SE Operations, LLC. The damage resulted from a fire allegedly caused by defective work performed by Defendants Wartsila North America, Inc and Wartsila Corporation (together, Wartsila) when overhauling one of the ship's engines. See Dkt 1 at ¶¶ 10–14.

Wartsila submits two declarations to explain and verify the background of this dispute. One is from David Smith, who is its marine sales manager. See Dkt 14-1. The other is from Spencer Weber, who is its field service superintendent. See Dkt 18-1. These declarations are consistent with the exhibits submitted by both parties. And they are entirely undisputed because Savage submitted no declarations in response.

The record reflects that Wartsila had performed work under contract with Savage on at least eleven prior occasions. See Dkt 14-1 at ¶ 19 (Smith declaration); see also Dkts 15, 16, and 17 (prior contracts). As to the now-disputed overhaul work, representatives of Savage initially contacted Wartsila in the Fall of 2017 to request that Wartsila perform the work. See Dkt 14-1 at ¶¶ 3–4. The exchanges between the parties leading to the contractual services that Wartsila later provided were somewhat complicated, to say the least.

Wartsila sent an email on December 20, 2017 with an initial "Field Service Offer" offering to do the work once the *Sulphur Enterprise* was in dry dock. See Dkt 14-2. The attached offer (designated SO-6842-1) referenced the product numbers of all three engines, sequentially specified as DG#1, DG#2, and DG#3. See Dkt 14-3 at 1.

Savage then requested on January 5, 2018 that Wartsila perform the overhauls while the ship was in transit. See Dkt 14-1 at ¶ 5 (Smith declaration). Wartsila explained that only one engine could be done in transit due to logistical issues. Savage then requested two field service offers—one to overhaul a single engine in transit, and one to overhaul the other two in dry dock. Ibid.

Wartsila sent Savage the two requested service quotes on January 9th. The email clearly indicated that one offer (designated SO-07464-1) was "to overhaul one engine pre-dry dock with a riding crew." Dkt 14-4 at 1. That offer referred specifically to the product number corresponding to the engine specified as DG#1. See Dkt 14-5. The other (designated SO-06842-2) replaced the prior offer and was "to overhaul the other two engines in dry dock." Dkt 14-4 at 1. That offer referred to the "Customized Overhaul of Auxiliary Engines (2 units)"—but then again referenced the product numbers of all three engines. Dkt 14-6 at 1, 4–5.

Each of these offers contained the standard terms and conditions by which Wartsila makes all of its offers. These provide for arbitration of disputes as follows:

> Any controversy, claim or dispute between the parties hereto arising out of or related to this

2

> Contract shall be submitted to the International Court of Arbitration of the International Chamber of Commerce for final and binding arbitration in accordance with the Rules of Arbitration of the International Chamber of Commerce by three (3) arbitrators appointed in accordance with the said Rules. The arbitration proceedings shall be in the English language and shall take place in Paris, France.

Dkt 14-3 at 19; Dkt 14-5 at 22; Dkt 14-6 at 22.

Savage accepted SO-7464-1 and provided Purchase Order SE180116-01 to Wartsila by email on January 16th. See Dkt 14-9. The email from Savage indicated that this work would be performed on the product number corresponding to DG#1. Id at 2. Wartsila confirmed receipt that same day and again attached a copy of its terms and conditions. Id at 1.

But Savage then provided express instructions on January 21st to perform the overhaul work on DG#3—not DG#1 as specified in the prior email. See Dkt 18-1 at ¶ 5 (Weber declaration); see also Dkt 14-1 at ¶ 5 (Smith declaration). That work commenced the following day while the ship remained at sea and in transit. See Dkt 18-1 at ¶ 2. The work on DG#3 then halted on February 5th because the engine was in worse condition than expected, requiring delay until the *Sulphur Enterprise* docked and necessary parts were brought on board. Id at ¶ 6.

Wartsila then sent an email on February 9th to replace and update SO-6842-2. See Dkts 14-11. The scope of work of the revised offer (designated SO-6842-3) was again indicated as "Customized Overhaul of Auxiliary Engines (DG # 1 & 2)." Dkt 14-12 at 4. But like before, the revision referenced the product numbers of all three engines. Id at 1. And again, the revised offer came with Wartsila's standard terms and conditions, including the arbitration clause. Id at 17.

Savage noted an issue with its "limited credit" by email of February 9th. Dkt 14-13 at 1–2. Wartsila instructed Savage to submit a new purchase order to accept the revised offer terms on

3

SO-6842-3. See Dkt 14-13 at 1. Savage responded by email of February 16th with "please use PO#: E2FC." Ibid.

Wartsila notes by declaration that reference to that purchase order number is "not an actual hard copy purchase order." Dkt 14-1 at ¶ 13 (Smith declaration). Wartsila requested by email dated February 28th that Savage send a hard copy for SO-6842-3 and eleven other outstanding purchase orders. See Dkt 14-14; see also Dkt 14-1 ¶ 15. Wartsila requested that Savage include language including the "quote number, your PO number and accepting our Terms and Conditions, and acknowledging that all FS orders may be subject to change orders throughout the job should we find something unexpected." Dkt 14-14 at 2. Savage did so on March 8th, sending Wartsila ten hard-copy purchase orders by email. See Dkt 14-16; see also 14-1 at ¶ 16. But Savage failed to include a hard-copy purchase order for SO-6842-3. Ibid.

The overhaul work on DG#3 then resumed on February 21st while the *Sulphur Enterprise* was dockside. See Dkt 18-1 at ¶¶ 8–9 (Weber declaration). Work on DG#1 began on February 24th. Id at ¶ 10. And work began on DG#2 on March 6th after the ship entered dry dock. Id at ¶ 12. Wartsila completed the overhauls of DG#1 and DG#3 before dry dock ended on May 3rd. Id at ¶¶ 12–13. Savage decided to complete work on DG#2 after the *Sulphur Enterprise* returned to service. Id at ¶ 12.

A fire broke out in the engine room as the ship entered the Port of Galveston four days later on May 7th. See Dkt 1 at ¶ 10. Savage alleges that this was caused by defective work performed by Wartsila when overhauling the fuel rack and other machinery on DG#3 between April 16th and April 25th. Id at ¶ 13; see also Dkt 22 at 15–24 (Wartsila on-site daily reports).

Savage brought causes of action against Wartsila for negligent performance of maritime contract, breach of contract, and "breach of warranty and/or breach of workmanlike performance." Dkt 1 at ¶¶ 24–27. Wartsila moved to compel arbitration under its standard terms and conditions. Dkt 14. Savage filed an amended complaint with permission to add a subcontractor as an additional party. Dkt 31. This amendment didn't affect the presentation of the motion, which by then was fully briefed.

4

2. Legal Standard

The Federal Arbitration Act provides, "A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under title 28, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement." 9 USC § 4. This permits a party to file a motion to compel arbitration when an opposing party "has failed, neglected, or refused to comply with an arbitration agreement." *American Bankers Insurance Co of Florida v Inman*, 436 F3d 490, 493 (5th Cir 2006).

To determine whether to enforce an arbitration agreement, the court first determines whether there is a valid agreement to arbitrate and then considers whether the subject dispute falls within the scope of that agreement. *Edwards v Doordash Inc*, 888 F3d 738, 743 (5th Cir 2018), citing *Klein v Nabors Drilling USA LP*, 710 F3d 234, 236 (5th Cir 2013). The court must compel arbitration if both elements are satisfied unless there is a federal statute or policy to the contrary. See *Sherer v Green Tree Servicing LLC*, 548 F3d 379, 381 (5th Cir 2008).

Two important clarifications pertain to the consideration of *validity* at the first step. First, federal courts don't consider general challenges to the validity of the *entire* contract at this stage, which pertains only to a motion to compel arbitration. *Buckeye Check Cashing, Inc v Cardegna*, 546 US 440, 449 (2006). This is because an arbitration agreement is severable from the underlying contract under Section Two of the Federal Arbitration Act. *Rent–A–Center, W, Inc v Jackson*, 561 US 63, 70–71 (2010). The question is whether the challenge is directed to the contract as a whole or to the arbitration agreement itself. So long as it is to the former, it doesn't prevent a court from considering and enforcing a specific agreement to arbitrate. Ibid. And if the court determines that a valid arbitration agreement exists, any remaining arguments that target the validity of the contract as a whole are questions for the arbitrator. *Edwards*, 888 F3d at 744, citing *Lefoldt ex rel Natchez*

5

*Regional Medical Center Liquidation Trust v Horne, LLP*, 853 F3d 804, 814 (5th Cir 2017).

Second, courts must distinguish between arguments attacking the *validity* or *enforceability* of a contract—which must be heard by the arbitrator—from arguments challenging the *formation* or *existence* of a contract. *Arnold v Homeaway, Inc*, 890 F3d 546, 550 (5th Cir 2018). Questions of contract formation and existence are for the court to decide. *Edwards*, 888 F3d at 744, citing *Kubala*, 830 F3d at 202.

In deciding both the validity of the arbitration agreement and its scope, courts apply ordinary principles of state contract law. *Kubala*, 830 F3d at 202, citing *Carey v 24 Hour Fitness, USA, Inc*, 669 F3d 202, 205 (5th Cir 2012).

    3.  Analysis

Savage wishes to avoid arbitration. It argues that no contract with an arbitration clause was formed as to the work on DG#3. It further asserts that—even if such contract does exist—the work performed on DG#3 doesn't fall within the scope of the terms and conditions. In the alternative, Savage seeks discovery and trial on contract formation. These positions all lack merit.

    a.  Contract formation

The Fifth Circuit holds that "a contract for the repair of a vessel is a maritime contract, governed by general maritime law." *One Beacon Insurance Co v Crowley Marine Services Inc*, 648 F3d 258, 262 (5th Cir 2011). Maritime law is a distinct body of law (both substantive and procedural) that governs navigation and shipping. It "stems from the maritime jurisprudence of the federal courts" and is "an amalgam of traditional common law rules, modifications of those rules, and newly created rules." 1 Thomas J Shoembaum, *Admiralty & Maritime Law* §§ 5-1, 5:14 (6th ed 2018), quoting *East River Steamship Corp v Transamerica Delaval, Inc*, 476 US 858, 864–65 (1986). Modern maritime law is interwoven with historical admiralty jurisdiction. Claims at law and at maritime are now substantively and procedurally similar, but they converged from a tangled past. See generally *Coronel v AK Victory*, 1 F Supp 3d 1175, 1182–90 (WD Wash 2014).

A court must first apply general maritime law, which is federal law. *International Marine, LLC v FDT, LLC*, 619 F Appx 342, 349 (5th Cir 2015). "Applying federal law in the contract context includes looking to 'principles of general contract law' that can be found in treatises or restatements of the law." Ibid, quoting *University of Texas System v United States*, 759 F3d 437, 443 (5th Cir 2014). State contract law also applies where "not inconsistent with admiralty principles." *Ham Marine Inc v Dresser Industries Inc*, 72 F3d 454, 459 (5th Cir 1995), citing *Koninklyke Nederlandsche Stoomboot Maalschappy NV v Strachan Shipping Co*, 301 F2d 741, 743 (5th Cir 1962).

Principles of both general contract law and Texas law recognize the Restatement (Second) of Contracts as instructive on basic contract formation. It defines a *contract* as a "promise or a set of promises for the breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty." Restatement (Second) of Contracts § 1 (1981). This depends on there being both an offer and an acceptance. An *offer* or *promise* is "a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made." *Montgomery County Hospital District v Brown*, 965 SW2d 501, 502 (Tex 1998), quoting Restatement (Second) of Contracts § 2(1) (1981). *Acceptance* is then a "manifestation of assent to the terms" offered. Restatement (Second) of Contracts § 50(1) (1981). And a party may accept a promise in many ways, including by performance. Id at § 50(2).

Whether a contract has been formed is a question of fact. *Ham Marine, Inc v. Dresser Industries, Inc*, 72 F3d 454, 458–59 (5th Cir 1995). With formation established the question shifts to an understanding of what the contract requires of both parties. The best evidence is the express terms—at least where the contract is reflected in a written document. Restatement (Second) of Contracts § 203(b) (1981). But the parties' course of dealing can establish or supplement the terms. Ibid. A *course of dealing* is "a sequence of previous conduct between the parties to an agreement which is fairly to be regarded as establishing a common basis of understanding for interpreting their

7

expressions and other conduct." Id at § 223(1). The Fifth Circuit recognizes that parties to marine repair contracts regularly develop a history of business dealings that supplement their contracts. See *Crowley Marine*, 648 F3d at 265; *Campbell v Sonat Offshore Drilling, Inc*, 979 F2d 1115, 1120 (5th Cir 1992), superseded on other grounds by statute.

There is no dispute that Wartsila in fact performed work on DG#3 aboard the *Sulphur Enterprise*. And there is also no dispute that Wartsila could have performed that work pursuant to only one of two offers solicited by Savage. These are SO-07464-1 and SO-06842-3. Each of these came with Wartsila's standard terms and conditions attached—meaning further that both came with an express clause requiring arbitration of all related disputes. See Dkt 14-5 at 22; Dkt 14-12 at 17.

The opposition by Savage attempts to say that the work was performed pursuant to neither of these offers—or rather, that no completed contract existed between the parties as to that work. See Dkt 22 at 1. And yet there Wartsila was, aboard the *Sulphur Enterprise* with permission from Savage performing the work on DG#3 as invited and instructed by Savage. No contrary contract or other set of differing terms is sponsored by Savage to explain this situation. Neither does it submit any explanatory declaration from a witness. And its briefing flatly acknowledges that "Wartsila was hired by Savage to perform an overhaul" of the ship's engines. Dkt 22 at 4. That alone establishes a contract—and should have been enough to dispose of resistance to arbitration by any party seeking in good faith to understand and comply with its contractual obligations.

Even so, Savage disputes formation as to both SO-7464-1 and SO-6842-3. Dkt 22 at 12, 15. The former, it says, was fully formed but didn't apply to DG#3. The latter, it says, was never fully formed at all. To the contrary, both apply. Perhaps the extent of overlap is unclear. But that makes it no less clear that the parties formed a contract to repair DG#3, with each potential option including the exact same arbitration terms.

*As to Field Service Offer SO-7464-1.* There is no dispute that the parties formed a contract related to SO-7464-1. Savage sent an

8

email to Wartsila and attached an actual purchase order, which itself included the general terms and conditions. See Dkt 14-7.

Savage seeks to avoid this contract, not by saying that there was no completed contract, but rather, that the contract as completed didn't apply to DG#3. It points out that SO-7464-1 doesn't specifically reference DG#3 and refers instead only to the product number for DG#1. See Dkt 14-5 at 1. Wartsila replies that, regardless of what product number the original document says, the work on DG#3 had to have been performed under SO-7464-1 because it is the only contract that refers to work to be performed while the ship was at sea. And the work on DG#3 without dispute began at sea—specifically at the direction of Savage. See Dkt 14-10 (01/18/2020 email); Dkt 14-1 at ¶ 5 (Smith declaration).

This is sufficient to establish not only the contract, but also its applicability to the current dispute. Were there any doubt, it is a standard principle of contract law that a contract "may be concluded which leaves a choice to be made by one party or the other," provided there be agreement as to all material terms. Restatement (Second) of Contracts §§ 33, 34 cmmt a (1981); see also *T O Stanley Boot Co v Bank of El Paso*, 847 SW2d 218, 221 (Tex 1992); *Coe v Chesapeake Exploration LLC*, 695 F3d 311, 320 (5th Cir 2012). Wartsila declares that it wasn't clear at the time of the first contract which engine would be worked on at sea, and so the DG#1 product number was used as a placeholder. See Dkt 14-1 at ¶ 5 (Smith declaration). Savage then clarified this by later, specific instructions directing work to commence on DG#3. See Dkt 18-1 ¶¶ 3–5 (Weber declaration).

Savage submits no declaration or evidence disputing this explanation of the back-and-forth between the parties leading to the contract. The parties clearly agreed to all material terms. So when Savage directed Wartsila to repair DG#3, it was only clarifying a term the parties intended to fill in later. See *General Metal Fabricating Corp v Stergiou*, 438 SW3d 737, 751–52 (Tex App—Houston [1st Dist] 2014, no pet), quoting Restatement (Second) of Contracts § 33 cmmt a (1981).

The Court finds that the parties formed a contract pursuant to SO-7464-1, that its scope of work included overhaul work

9

performed on DG#3, and that the contract's terms unambiguously call for arbitration of the dispute between the parties.

*As to Field Service Offer SO-6842-3.* There is no dispute that the general terms and conditions were attached by Wartsila to SO-6842-3. And there is no dispute that the scope of work referred to all three engines—DG#1, DG#2, and DG#3.

Savage seeks to avoid this as a contract—not by saying that it didn't apply to DG#3, but rather, that no completed contract was ever formed as to that offer. See Dkt 22 at 13. To make that argument, Savage doesn't disavow *accepting* that offer. It instead claims that its own failure to submit a hard copy of a written purchase order prevents any finding of acceptance of the contract *by Wartsila*. Ibid.

Savage cites for support the initial paragraph to Wartsila's general terms and conditions:

> The Supplier's offers are non-binding until accepted and confirmed by a purchase order issued by the Buyer in compliance with these Conditions which is acknowledged by the Supplier (any such acknowledged purchase order, a "Contract"). These Conditions shall form an integral part of the Contract.

Dkt 14-12 at 13.

Savage acknowledges that this provision doesn't "specify the appropriate process for issuing a purchase order, for 'accepting and confirming by a purchase order,' or acknowledging the purchase order." Dkt 22 at 5. And yet it proceeds to argue that "Savage did not issue a purchase order with respect to the defective work performed on DG#3, and Wartsila did not acknowledge any purchase order with respect to this defective work." Ibid. It also refers to an email request by Wartsila—on February 12, 2018—asking that Savage submit a hard-copy purchase order expressly stating the purchase-order number, accepting the terms and conditions, and acknowledging that all work is subject to change orders. See Dkt 14-14. Savage argues that this request precludes a finding that a contract was formed—even though Wartsila recommenced its work on DG#3 on

10

February 21st with Savage's knowledge and permission. See Dkt 22 at 13.

Savage doesn't dispute that it accepted SO-6842-3. Nor could it. See Dkt 14-13 (02/16/2018 email). And it cites no contractual provision or underlying principle of contract law that would require Savage to expressly email a hard-copy purchase order as a condition precedent to its acceptance. To the contrary, it is not uncommon for valid ship-repair contracts to be formed after an oral agreement or similar informal acceptance with a hard copy submitted after the fact. See *Crowley Marine*, 648 F3d at 265. Such general terms and conditions are enforced even in such oral contracts, where the counterparty was aware of and consented to the additional terms. Ibid. Maritime law also provides for liberal enforcement of external terms and conditions. Ibid.

That is sufficient. But the record also establishes that Savage had previously entered into eleven contracts with Wartsila—each of which contained the standard terms and conditions mandating arbitration. See Dkt 14-1 at ¶ 19 (Smith declaration); Dkts 15, 16, and 17 (prior contracts). This constitutes a course of dealing for purposes of contractual interpretation. See *Campbell*, 979 F2d at 1120. And where parties establish a course of dealing, it informs the terms in subsequent dealings, as derived by the parties' intent. See *Crowley Marine*, 648 F3d at 265, citing Restatement (Second) of Contracts § 223 (1981). The course of dealing here shows that the parties' regular practice is to use Wartsila's terms and conditions. And no evidence suggests that either party viewed this instance as any different. There is simply no way to view Savage's acceptance of Wartsila's offer as coming with anything other than the same standard terms and conditions, including the provision on arbitration of disputes.

Savage ultimately seeks to misdirect attention from the actual point at issue—its own acceptance of an offer from Wartsila. Quite simply, Savage emailed Wartsila to accept SO-6842-3, going so far as provide a purchase-order number for use. See Dkt 14-13. It simply didn't issue a hard copy of that purchase order as requested. See Dkts 14-14, 14-15. That is hardly reason to conclude that no contract was formed—or, more precisely, that a contract was formed but suddenly stripped of Wartsila's

11

standard terms and conditions by which its offer was made and that had pertained to all prior contracts between the parties.

The Court finds that Savage validly consented to the application of Wartsila's general terms and conditions when accepting SO-6842-3 by email in accord with their prior course of dealing. As such, Savage agreed to be bound by the arbitration clause at issue here.

b.   Scope of the arbitration agreement

Wartsila's standard terms and conditions state that they apply only to "service work" performed by "any authorized member, agent or representative" of Wartsila. For example, see Dkt 14-5 at 15. Savage asserts that the work at issue was performed not by Wartsila, but by one of its subcontractors, Mantenimiento Asesoria y Servicios, SA (MAS). And so it seeks to avoid the arbitration clause on argument that a subcontractor isn't an "authorized member, agent, or representative." Dkt 22 at 22.

This misunderstands the district court's role. Its first role is to determine whether there's a valid arbitration agreement. That's already been established. Its second role is to determine if the dispute falls within the scope of the agreement. *Klein*, 710 F3d at 236. That is, the court is to interpret the arbitration agreement—not the rest of the contract. The terms and conditions do state that they apply only to service work by authorized members. See Dkt 14-5 at 15. But the arbitration provision applies to "[a]ny controversy, claim or dispute between the parties hereto arising out of or related to this Contract . . . ." Id at 22. At the very least, the instant dispute is *related to* the at-issue contract. That is sufficient.

The argument by Savage also fails on the merits even if it weren't entirely misdirected. The express term *subcontractor* doesn't appear in the listed entities, but general terms encompass those that are more specific. This is known as the *General-Terms Canon*, which states, "General terms are to be given their general meaning." Antonin Scalia & Bryan A. Garner, *Reading Law* 101–06 (West 2012). A respected legal dictionary defines *agent* as "[s]omeone who is authorized to act for or in place of another; a representative." *Black's Law Dictionary* 75 (Reuters 10th ed 2009). It defines *representative* as "[s]omeone who stands for or acts on

behalf of another." Id at 1494. As a subcontractor, MAS was performing work on behalf of Wartsila within the comprehension of both terms.

Simply put, the scope of the arbitration agreement covers the work at issue.

### c. Request for discovery and trial

Savage requests in the alternative a trial on contract formation. It also seeks extensive deposition testimony and written discovery in this regard as to whether work was performed under SO-7464-1 or SO-6842-3 and as to the specific scope of the work. Dkt 22 at 23–24.

This is unnecessary. Savage hasn't even submitted a declaration countering the factual predicate laid by the two declarations and numerous exhibits submitted by Wartsila. Beyond this, both SO-7464-1 and SO-6842-3 came with Wartsila's standard terms and conditions, which unquestionably require arbitration. The Fifth Circuit holds that parol evidence is inadmissible where a contract is unambiguous. For example, see *Sonat Offshore Drilling*, 979 F2d at 1127.

Arbitration must be compelled. *Sherer*, 548 F3d at 381.

### 4. Conclusion

The motion to compel arbitration is GRANTED. Dkt 14.

It is ORDERED that the claims against Wartsila North America, Inc and Wartsila Corporation be arbitrated in Paris, France in accordance with the arbitration agreement.

The claims in this litigation are STAYED until the arbitral and confirmation proceedings conclude.

SO ORDERED.

Signed on October 26, 2020, at Houston, Texas.

Hon. Charles Eskridge
United States District Judge